**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) Plaintiff, ) | Case No. 2:06-cr-00056-KJD-PAL |
| ) vs. ) | **REPORT OF** |
| ) SAMUEL CLAY, ) | **FINDINGS AND RECOMMENDATION** |
| ) Defendants. ) | (M/Suppress - #19) |

This matter is before the Court on Defendant Samuel Clay's Motion to Suppress (#19) which was referred to the undersigned for Findings and Recommendations pursuant to 28 U.S.C. § 636(b)(1)(B), and LR IB 1-3 and IB 1-4.  The Court has considered the motion, the Government's Response (#20), the Reply (#21), and evidence adduced at an evidentiary hearing conducted August 11, 2006.

**BACKGROUND**

The defendant, Samuel Clay ("Clay") is charged in a criminal indictment returned February 15, 2006, with felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2).  The indictment also contains forfeiture allegations.  The indictment arises out of a traffic stop of Clay and his traveling companions in a vehicle on Las Vegas Boulevard on August 27, 2005 by two Las Vegas Metropolitan Police Department ("LVMPD") officers assigned to the South Central Command.

In the current motion, Clay, who was the driver of the vehicle at the time of the traffic stop, seeks to suppress "[a]ny and all contraband, instrumentalities or evidence of any offense seized or obtained" as a result of the stop and subsequent search, seizure and arrest, along with all "derivative evidence." (Mot. at 1:28-2:1, 2:24.).  First, Clay argues that the stop of the vehicle he was driving violated the Fourth and Fourteenth Amendments to the U.S. Constitution as well as Article 1, sections 8

and 18 of the Constitution of the State of Nevada because it was not based on a traffic violation under Nevada state law, or upon probable cause.  Because the initial stop was unconstitutional, Clay argues that the subsequent search, seizure and arrest were likewise unconstitutional, and that any evidence that was a product of the stop must be suppressed.  Second, Clay contends that when one of the LVMPD officers opened the rear passenger door and observed a firearm on the rear floor board, he conducted a warrantless unlawful search and that the rear passenger's alleged furtive movement did not establish probable cause for the search.  Third, Clay argues that the officer's observation of a weapon on the rear floorboard did not provide probable cause to remove all of the occupants from the vehicle and to arrest them.  Clay argues that because his arrest was unlawful, the officers could not lawfully search the vehicle or its passengers, and that any evidence derived from the car, or from conversations with the passengers subsequent to their arrest, must be suppressed.

The government responds that the officers had probable cause, or at a minimum, reasonable suspicion that a traffic violation had occurred because the vehicle was not moving and impeding or blocking traffic flow.  Second, the government argues that the rear passenger's furtive movements which appeared to hide an object and refusal to show his hands to the police on command, supported the officer's decision to remove the passenger from the vehicle.  Third, the government asserts that the officer's observation of the firearm on the rear floorboard where the passenger was seated established probable cause to search the defendant's vehicle for additional weapons, and to seize the weapons found inside the car in plain view.  Finally, the government contends that Clay's statements are admissible because *Miranda* warnings had been administered, and the police conduct which proceeded his arrest was lawful.

Clay replies that the vehicle stop was not based on either probable cause or reasonable suspicion because the vehicle was blocked by a traffic jam and by people in the roadway.  In addition, he argues that his statements to the police were the fruit of the preceding unlawful stop of the vehicle and his unlawful arrest, notwithstanding the administration of *Miranda* warnings.

At the evidentiary hearing, the government called Officer Brandon Borden and Officer Peter Connell.

/ / /

**Testimony of Officer Brandon Borden**

Officer Brandon Borden ("Borden") has been employed by LVMPD as a patrol officer for four and half years and is assigned to the South Central Command. On the evening of August 27, 2005, Borden was on patrol on his bicycle as part of "Operation Safe Strip," along with Officer Peter Connell ("Connell"), near the intersection of Las Vegas Boulevard and Harmon.

Around midnight, he observed a black vehicle on Las Vegas Boulevard near the intersection with Harmon stopped in the right lane. He observed a large group of people standing near the vehicle in a merge lane, and talking to the occupants of the vehicle. He characterized the exchange between the two groups as a disturbance. He reported the observation to dispatch and made a vehicle stop. Borden approached the vehicle on the passenger side, while his partner, Connell, approached on the driver's side.

As he approached the vehicle, Borden observed a passenger sitting in the rear passenger side seat, stuffing an object under the seat. He made this observation through the vehicle's tinted window. Borden ordered the passenger to show him his hands several times. When the passenger did not comply, Borden drew his weapon and opened the vehicle door. Borden explained that department policy instructs that when a passenger makes furtive gestures and refuses to show his or her hands, an officer should go "hands on" and place the passenger in custody for purposes of officer safety. Borden opened the passenger door to make contact with the passenger in the rear seat because "I want to go home at night." When Borden opened the vehicle door, the passenger looked up at him, and Borden observed a gun between his legs. Upon seeing the gun, Borden yelled "gun" and grabbed the passenger, pulled him from the vehicle, and placed him in custody. Borden and Connell then removed the other passengers from the vehicle and placed them in custody as well. Borden then returned to the vehicle with a flashlight to determine whether there were other weapons inside. He observed two additional guns in plain view. All three guns were loaded. He also performed a records check that indicated that Clay was a convicted felon, prohibited from possessing firearms. After learning Clay was a convicted felon, Borden placed Clay under arrest.

On cross-examination, Borden stated that he did not write any reports about this incident. He first observed the vehicle from a distance of 30-40 yards, which he later corrected and stated was a

1  distance of 30-40 feet.  It is not unusual to see people walking in the street in the evenings on Las Vegas
2  Boulevard, nor was it unusual for the traffic to be heavy.  He could not hear the content of the
3  conversation between those inside the vehicle and the individuals in the roadway or on the sidewalk.
4  While it would be prudent and lawful for a vehicle to stop if persons were standing in the roadway
5  blocking the vehicle, in this case, the individuals talking to the passengers in the vehicle were standing
6  in the gutter, and were not blocking the vehicle from moving forward.  When the light at the
7  intersection at Harmon turned green, the vehicles in front of Clay's proceeded forward on Las Vegas
8  Boulevard, while Clay's vehicle remained in place, blocking traffic.  No vehicles or pedestrians
9  prevented Clay's car from moving.  It took Borden and Connell three to four seconds to reach the
10 vehicle from their initial vantage point.

11       He reiterated that drawing his weapon was standard policy when a subject makes furtive
12 gestures and refuses to comply with multiple orders to show his hands, as was the case with Clay's
13 passenger, because of risk to officer safety.  Borden demonstrated the movements of the rear seat
14 passenger which he found suspicious, and conceded that dropping a Coke or french fries on the floor
15 was one of many alternative explanations for the passenger's behavior.  Borden indicated that he first
16 saw the handle of a gun on the floorboard of the vehicle.  Clay was arrested for felon in possession of a
17 firearm, and was not cited for the traffic violation because issuing a misdemeanor citation at the same
18 time an individual is arrested for a felony is not his department's policy.  When shown a copy of an
19 excerpt of department policy which contains an exception when a misdemeanor investigation develops
20 probable cause for a felony arrest or search and seizure, Borden explained that issuance of a citation
21 was discretionary rather than mandatory.

22       Borden and Connell parked their bikes in the rear of the vehicle and approached on foot.  As
23 Borden approached the passenger side and Connell approached the driver's side, Borden observed the
24 passenger's torso pressed against his knees, moving his hands on the floor, and shuffling his shoulders.
25 Borden did not see the gun on the floor board until he opened the rear passenger door.

26 **Testimony of Officer Peter Connell**

27       Officer Peter Connell has been a patrol officer with LVMPD for six years, whose duties include
28 bike patrol for the South Central Command with his partner, Officer Brandon Borden.  At midnight on

1  August 27, 2005, he observed a vehicle stopped at a green light on the Strip, backing up the traffic
2  behind it.  The vehicle's passengers were speaking to five or six individuals on the roadway.  He and
3  Borden approached the vehicle from the rear, dismounted, and Connell approached on foot along the
4  driver's side of the vehicle.  Connell asked the driver for his license and registration, and at the same
5  time saw a passenger in the rear seat stuffing something underneath the seat.  Connell advised Borden,
6  who was standing on the passenger side, of what he saw.  Connell heard Borden tell the rear passenger
7  to show his hands, then saw Borden open the rear door and heard him yell "gun."
8         After the passengers were removed from the vehicle, Connell and Borden searched the vehicle
9  and found three guns on the floor board in plain view where all of the occupants had been seated.
10 Connell checked to see if the passengers had a legal reason for having the guns, *i.e.*, whether they had a
11 blue card indicating the guns were legally registered.  He also ran the guns' serial numbers.  He could
12 not recall the result of the check for registration.  After a records check revealed Clay was a convicted
13 felon, he was arrested for felon in possession of a firearm.  The other passengers were detained while
14 the guns were secured and the records and criminal history checks were completed.   A bag of
15 marijuana was also found under the seat of one of the passengers.
16        On cross-examination, Connell explained that Operation Safe Strip focuses on keeping the Las
17 Vegas Strip safe by focusing on traffic flow, pedestrians crossing the street, pickpockets, prostitution
18 and illegal gambling.  While teenagers are not a priority of the program, teenagers get stopped at night
19 for curfew violations.  He wrote two documents pertaining to this incident: a declaration of arrest at
20 approximately 12:30 p.m., and an arrest report after the conclusion of his shift.  Clay was not issued a
21 misdemeanor traffic citation because it is not the Department's policy to "stack charges."
22        Approximately ten to fifteen minutes elapsed from the time when Borden removed the
23 passenger from the rear seat, and Clay was arrested.  During that period of time, Connell and Borden
24 secured the passengers, checked for weapons and contraband, and ran a criminal history check, vehicle
25 check, and gun registration and serial number check.  Clay was arrested for felon in possession of a
26 firearm once his felony status was confirmed.  Traffic was probably bumper to bumper in the area of
27 Las Vegas Boulevard where the stop occurred.  It is not unusual to see a lot of pedestrian traffic or
28 pedestrians walking in front of vehicles and impeding traffic flow.  Seeing five to six black males in the

area which is near a popular club across the street on Las Vegas Boulevard where this stop occurred was also not unusual.

### DISCUSSION

The Fourth Amendment secures "the right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures." U.S. Const. amend. IV. The Fourth Amendment protects reasonable and legitimate expectations of privacy. Katz v. United States, 389 U.S. 347 (1967). The Fourth Amendment protects "people not places." Id. Evidence obtained in violation of the Fourth Amendment, and evidence derived from it may be suppressed as the "fruit of the poisonous tree." Wong Sun v. United States, 371 U.S. 471 (1963).

**A.     The Traffic Stop**

It is undisputed that Clay was seized for purposes of the Fourth Amendment. The parties' dispute was whether the seizure was unreasonable within the meaning of the Fourth Amendment. For Fourth Amendment purposes, the seizure of a person occurs when a law enforcement officer in some way restricts the liberty of a citizen, either by physical force or show of authority. Florida v. Bostick, 501 U.S. 429, 434 (1991). A citizen's liberty is restrained if, "taking into account all of the circumstances surrounding the encounter, the police conduct would 'have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.'" Id. at 437, quoting, California v. Hodari D., 499 U.S. 621, 628 (1991). The United States Supreme Court reaffirmed the holdings in Bostick and Hodari D., reiterating that to determine whether an individual has been seized for Fourth Amendment purposes, the court must consider the totality of all the circumstances surrounding the encounter. United States v. Drayton, 536 U.S. 194 (2002). The reasonable person test is an objective one and "presupposes an *innocent* person." Id. at 202, quoting, Bostick at 437-38 (emphasis in original). Whether a person has been seized for purposes of the Fourth Amendment is a mixed question of law and fact. United States v. Kim, 25 F.3d 1426, 1430 (9th Cir. 1994).

A traffic stop is a seizure for purposes of the Fourth Amendment. Even a brief temporary detention of an individual for a routine traffic stop is a seizure for purposes of the Fourth Amendment. Delaware v. Prouse, 440 U.S. 648, 653 (1979). The Fourth Amendment "prohibition against

6

unreasonable searches and seizures extends to the investigatory stops of a vehicle." United States v. Sigmond-Ballesteros, 247 F.3d 943, 946 (9th Cir. 2001), citing, United States v. Brignoni-Ponce, 422 U.S. 873, 878 (1975).  An officer making an investigatory stop of a vehicle "must have at least a reasonable suspicion of criminal misconduct before detaining a driver."  United States v. Rojas-Millan, 234 F.3d 464, 468 (9th Cir. 2000), citing, Delaware v. Prouse, 440 U.S. 648, 653 (1979).  As long as there is an objectively reasonable basis to perform a traffic stop, the stop will be permitted by the Fourth Amendment.  United States v. Morales, 252 F.3d 1070, 1074 (9th Cir. 2001), citing, Whren v. United States, 517 U.S. 806, 813 (1996).

The Ninth Circuit defines "reasonable suspicion" as, "specific, articulable facts which, together with objective and reasonable inferences, form the basis for suspecting that the particular person detained is engaged in criminal activity."  Rojas-Millan, 234 F.3d at 468-69, quoting, United States v. Lopez-Soto, 205 F.3d 1101, 1105 (9th Cir. 2000).  A police officer "is entitled to rely on his training and experience in drawing inferences from the facts he observes, but those inferences must also 'be grounded in objective facts and be capable of rational explanation.'"  Lopez-Soto, 205 F.3d at 1105, quoting, United States v. Michael R., 90 F.3d 340, 346 (9th Cir. 1996).  If an officer does not have reasonable suspicion, and the traffic stop therefore violates the Fourth Amendment, any evidence obtained as a result of the stop must be suppressed as fruit of the poisonous tree.  United States v. Thomas, 211 F.3d 1186, 1192 (9th Cir. 2000), citing, Wong Sun v. United States, 371 U.S. 471, 484-85 (1963).

The court found the testimony of both Officer Borden and Officer Connell credible that they observed Clay's vehicle stopped in the rightmost lane on Las Vegas Boulevard after the light had turned green, blocking traffic in violation of state traffic law.  The court found the officers' testimony credible that no pedestrians or other vehicles impeded Clay's ability to move forward.  Finally, the court found the officers credible that they observed the occupants of Clay's vehicle engaged in a discussion, characterized as a disturbance, with persons near the vehicle.  The court, therefore, finds the officers had reasonable suspicion to conduct an initial traffic stop to investigate the reason Clay's vehicle was blocking traffic, and a possible disturbance between the vehicle's occupants and pedestrians.  The initial stop was, therefore, reasonable within the meaning of the Fourth Amendment.

**B.      Scope of the Stop**

Clay argues that when Officer Borden opened the rear passenger door and observed a gun at the rear passenger's feet, he conducted a warrantless search in violation of the Fourth Amendment. The scope of permissible police activities during an investigatory detention must be reasonably related to the circumstances that initially justified the detention. See U.S. v. Sharpe, 470 U.S. 675, 682 (1985); see also Hiibel v. Sixth Judicial District Court, 542 U.S. 177, 185-86 (2004). Because of the inherent dangers of routine traffic stops, the Supreme Court has held that police may lawfully order a driver of a car stopped in a routine traffic offense to get out of the car even in the absence of particularized suspicion that the person posed a danger. Pennsylvania v. Mimms, 434 U.S. 106 (1977). The Supreme Court has also held that the police may order occupants out of a vehicle they have lawfully detained whether or not they have reasonable suspicion that the occupants have engaged in criminal activity because passengers are already stopped with the driver of the car, and the additional intrusion of ordering them out is minimal when balanced against officer safety concerns. Maryland v. Wilson, 519 U.S. 408 (1997).

The Ninth Circuit has recognized that "[p]olice officers are entitled to employ reasonable methods to protect themselves and others in potentially dangerous situations." Allen v. City of Los Angeles, 66 F.3d 1052, 1056 (9th Cir. 1995). "Police officers also need not avail themselves of the least intrusive means of responding to an exigent situation." Id. at 1057 (quoting Scott v. Henrich, 39 F.3d 912, 915 (9th Cir. 1994) (internal quotations removed)). The relevant inquiry is one of reasonableness given the circumstances. Id. The Ninth Circuit has also recognized that for officer safety, police may order a passenger out of the car during a routine traffic stop. Ruvalcaba v. City of Los Angeles, 64 F.3d 1323, 1326-27 (9th Cir. 1995). An officer may also point a gun at the passenger of a vehicle, force him to lie on the ground, handcuff and detain him despite being cooperative if a fellow passenger in the vehicle was combative and refused to adhere to a police officer's instructions. Allen, 66 F.3d at 1057. Additionally, in U.S. v. Garcia-Rivera, 353 F.3d 788, 791 (9th Cir. 2003), the Ninth Circuit found that it was reasonable for police to conduct a pat-down search, conduct a record check, and request consent to search a vehicle after a valid traffic stop based on the suspect's furtive movements and failure to provide valid documentation.

1    Here, the court has found the officers conducted a valid traffic stop based on reasonable
2 suspicion of a violation of state traffic law, and to conduct an investigatory detention of a possible
3 disturbance between the vehicle's occupants and pedestrians.  The officers approached on foot.  Officer
4 Borden observed the rear passenger making furtive movements, leaning forward with his torso on his
5 knees, moving his hands, and shuffling his shoulders as if stuffing something under his seat.  Borden
6 ordered the passenger to show his hands several times, but the passenger did not comply.  Connell also
7 saw the passenger making furtive movements as if placing something under his seat from his vantage
8 point at the driver's window, and advised Borden who was standing on the passenger side of the
9 vehicle, of what he saw.  Borden drew his weapon only after observing the furtive gestures and the
10 passenger's repeated failure to comply with multiple orders to show his hands.  Under these
11 circumstances, the court finds Officer Borden's conduct in drawing his weapon and opening the
12 passenger door was objectively reasonable to ensure officer safety.  Police may make a protective
13 search for weapons in the absence of probable cause to arrest "to neutralize the threat of physical
14 harm."  Terry v. Ohio, 392 U.S. 1, 24 (1968).  Although he lacked probable cause for an arrest, Officer
15 Borden had the right to protect himself, his partner, and members of the public.  Opening the passenger
16 door was an objectively reasonable measure to determine whether the passenger had a weapon and a *de*
17 *minimis* intrusion.

18    The Supreme Court has recognized the "inordinate risk confronting an officer as he approaches
19 a person seated in an automobile."  Pennsylvania v. Mimms, 434 U.S. 106, 110.  The danger presented
20 to police officers in routine traffic stops prompted the Supreme Court to hold that police may order the
21 occupants out of an automobile during a stop for a traffic violation, and may frisk for weapons if there
22 is a reasonable belief that they are armed and dangerous.  Id.  A series of Supreme Court cases have
23 recognized that police may make protective searches based on a reasonable belief that a suspect poses a
24 danger.  In Michigan v. Long, the Supreme Court held that a protective search of the passenger
25 compartment is constitutionally permissible when an officer has a reasonable belief that the suspect
26 poses a danger to him or the public.  463 U.S. 1032, 1049 (1983).

27    The testimony is uncontroverted that upon opening the rear passenger door, Borden immediately
28 saw a gun on the floor board near the feet where the passenger had been sitting and making furtive

1  gestures.  Under these circumstances, it was objectively reasonable to order the driver and passengers
2  out of the vehicle, handcuff them, and search the interior of the vehicle for additional weapons.
3  Ensuring that there were no other weapons within access of the occupants was objectively reasonable.
4  The fact that the occupants were removed from the vehicle and under the officers' temporary control
5  does not alter this conclusion.  As the Supreme Court has recognized, suspects may break away from
6  police control and retrieve a weapon.  Michigan v. Long, Id. at 1051.  Similarly, suspects who are not
7  arrested will be permitted to reenter the vehicle and have access to any weapons inside.  Id. at 1052.  An
8  officer is particularly vulnerable during a Terry investigative detention in part because a full custodial
9  arrest has not been made.  Id., citing Terry v. Ohio.  A police officer in a Terry stop must make quick
10 decisions on how to protect himself and others from possible dangers.  Id.

   Here, the officers were conducting a lawful Terry investigatory detention and developed
reasonable suspicion that the passenger may be dangerous and gain access to a weapon.  As such, they
were entitled to search the interior of the automobile, including the passenger compartment to ensure
officer safety.  Additional weapons were found on the floor board where each of the occupants had been
seated in plain view.  The officers' seizure of these weapons was objectively reasonable to ensure
officer safety.  Similarly, the officer's conduct in identifying all of the occupants of the vehicle,
conducting a records check, and checking the gun registration and serial numbers was reasonably
related to the circumstances justifying the stop, and the officers' discovery of weapons inside the
vehicle.  When the records check confirmed that Clay was a convicted felon prohibited from possessing
firearms, the officers had probable cause to arrest him.

   **C.   Clay's Statements**

   Clay argues that his post-arrest statements about how he got the gun were the product of preceding Fourth Amendment violations and must, therefore, be suppressed under the fruit of the poisonous tree doctrine.  The court has found that the officers had reasonable suspicion to conduct the traffic stop, that the police activities following the initial investigatory detention were reasonably related to the circumstances that initially justified the detention, and that the officers were objectively reasonable in searching the interior of the vehicle for weapons and seizing the weapons for officer
\ \ \

safety. Clay's statements to the police after his arrest were, therefore, not the product of a Fourth Amendment violation and need not be suppressed under the fruit of the poisonous tree doctrine.

### D. Clay's State Law Claims

Clay's motion also seeks to suppress evidence seized as a result of his traffic stop on the basis of asserted violations of Nevada state law and the Nevada State Constitution. However, the general rule is that state law violations do not require suppression of evidence in federal cases. United States v. Chavez-Vernaza, 844 F.2d 1368, 1374 (9th Cir. 1987) ("evidence seized in compliance with federal law is admissible without regard to state law," even when state authorities obtained the evidence without any federal involvement). The Ninth Circuit reasoned that "requiring federal district courts to look to state law when determining the admissibility of evidence obtained in accordance with federal law would hamper the enforcement of valid federal laws and undermine the policy favoring uniformity of federal evidentiary standards." Id. Similarly, in United States v. Cormier, the Ninth Circuit recognized "evidence will only be excluded in federal court when it violates federal protections, such as those contained in the Fourth Amendment and not in cases where it is tainted solely under state law." 220 F.3d 1103, 1111 (9th Cir. 2000) ( citations omitted). There are two exceptions to the general rule, neither of which apply here. The evidence sought to be suppressed here was obtained in accordance with federal law and Clay's state law based claims do not require suppression.

### CONCLUSION

The officers here conducted a routine traffic stop based on reasonable suspicion that Clay was in violation of Nevada state traffic law. The officers conducted a limited investigatory detention to investigate the traffic infraction and a possible disturbance between the occupants of Clay's vehicle and the pedestrians near the vehicle. Officer Borden's conduct in drawing his weapon after observing the rear passenger make furtive gestures consistent with hiding something, and refusing repeated commands to show his hands, was objectively reasonable under the totality of the circumstances. Once the gun was discovered on opening the rear passenger door, the officers' conduct in ordering all of the occupants out of the vehicle and checking the vehicle for additional weapons was objectively reasonable. When the criminal records check confirmed Clay was a convicted felon, the officers developed probable cause to arrest him. Clay's Fourth Amendment rights were not violated.

For all of the foregoing reasons,

**IT IS THE RECOMMENDATION** of the undersigned United States Magistrate Judge that Defendant Samuel Clay's Motion to Suppress (#19) be DENIED.

Dated this 28th day of September, 2006.

_____
PEGGY A. LEEN
UNITED STATES MAGISTRATE JUDGE